NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2018 VT 45

No. 2016-166

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, |
| | Criminal Division |
| | |
| William Schenk | March Term, 2017 |

A. Gregory Rainville, J.

Justin Jiron, Acting Chittenden County State's Attorney, and Aimee Griffin, Deputy State's Attorney, Burlington, for Plaintiff-Appellee.

Matthew F. Valerio, Defender General, Rebecca Turner, Appellate Defender, and James LaRock and Andrew Rome, Law Clerks (On the Brief), Montpelier, for Defendant-Appellant.

James Diaz, Lia Ernst and Julie Kalish, ACLU Foundation of Vermont, Montpelier, for Amicus Curiae American Civil Liberties Union Foundation of Vermont.

Thomas J. Donovan, Jr., Attorney General, and Benjamin D. Battles, Assistant Attorney General, Montpelier, for Amicus Curiae Vermont Attorney General.

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1. **DOOLEY, J.** Defendant William Schenk was charged with two counts of disorderly conduct, in violation of 13 V.S.A. § 1026(a)(1), in connection with the distribution of Ku Klux Klan recruitment flyers in the City of Burlington. For each count, the State charged that the penalty should be enhanced under 13 V.S.A. § 1455 because the crime was hate-motivated. Defendant appeals the trial court's denial of his motion to dismiss the two disorderly conduct charges and the associated sentence enhancement. We hold that the State failed to establish a

prima facie case because defendant's conduct conveyed neither the physical nor imminent threat of harm that we construe the definition of "threatening behavior" to require. Accordingly, we do not reach defendant's challenge to the application of the hate-motivated crime sentence enhancement. We reverse and grant defendant's motion to dismiss.

¶ 2. The facts may be summarized as follows. In late October 2015, two women in Burlington found flyers advertising the Ku Klux Klan at their homes. One of the women is Mexican American; the other is African American. One woman found the flyer folded up and inserted into the mailbox by her front door, while the other woman found the flyer tucked into her front door. The one-page flyer depicted a hooded and robed Klansman mounted on a horse and holding a burning cross. The Confederate flag and the colonial thirteen-star American flag are shown behind the horse and rider. Across the top of the flyer were the words: "Join the Klan and Save Our Land!!!!" The bottom of the flyer read "United Northern & Southern Knights of the Ku Klux Klan" and included a web address. The flyer had no other content. Neither woman saw this flyer at neighboring homes.

¶ 3. Burlington police canvassed the area where the flyers were found looking for other flyers, though they were unable to speak with some residents because those residents were not at home. Police also reached out through social media and the local news to determine whether any other flyers had been found. The only other reported sighting was at a local copy store, where an employee reported finding the flyer in one of the store's copy machines. Police viewed surveillance camera footage from the store and were able to identify defendant. The investigating detective then contacted defendant. Defendant admitted to distributing the flyers and explained that he is a Kleagle, a recruiter for the Ku Klux Klan. Defendant told the detective that he had distributed a total of thirty to forty flyers in neighborhoods that defendant described as "more white."

2

¶ 4.    The State charged defendant with two counts of disorderly conduct under 13 V.S.A. § 1026(a)(1), which states that:

> A person is guilty of disorderly conduct if he or she, with intent to cause public inconvenience or annoyance, or recklessly creates a risk thereof . . . engages in fighting or in violent, tumultuous, or threatening behavior . . . .

For each count, the charging information specifically alleged that defendant had "recklessly created a risk of public inconvenience or annoyance when he engaged in threatening behavior, TO WIT, by anonymously placing a flyer endorsing the Ku Klux Klan." The State also sought a hate motivated crime sentence enhancement under 13 V.S.A. § 1455.[1]

¶ 5.    Defendant filed a motion to dismiss the charges under Vermont Rule of Criminal Procedure 12(b)(2)(B), which permits a defendant to raise at any time "a claim that the indictment or information fails to state an offense." As the court noted in its decision, the motion to dismiss for failure to state an offense was essentially converted into a motion to dismiss for lack of a prima facie case under Rule 12(d). In his motion, defendant argued that his conduct was protected speech under the U.S. Constitution's First Amendment and that his speech did not fall into any of the narrow categories of unprotected speech, such as true threats. The trial court held an evidentiary hearing on defendant's motion at which the two alleged victims and the investigating police officer testified. The court applied the standard for whether the State demonstrated a prima facie case: "whether, taking the evidence in the light most favorable to the State and excluding modifying evidence, the State has produced evidence fairly and reasonably tending to show the defendant guilty beyond a reasonable doubt." State v. Dixon, 169 Vt. 15, 17, 725 A.2d 920, 922 (1999) (quotation omitted). The court concluded in a written order that defendant's conduct was the kind

---

[1]    13 V.S.A. § 1455 applies when the person has committed "any crime" and the conduct involved is "maliciously motivated by the victim's actual or perceived race, color, religion, national origin, sex, ancestry, age, service in the U.S. Armed Forces, disability as defined by 21 V.S.A. § 495d(5), sexual orientation, or gender identity." The effect of a determination that the crime was hate-motivated is to enhance the maximum sentence for the crime.

3

of threatening behavior proscribed by 13 V.S.A. § 1026(a)(1), the disorderly conduct statute. The court correctly noted that this Court has construed this statute such that correct application of the threatening behavior provision steers away from constitutional infirmity. See State v. Albarelli, 2011 VT 24, 189 Vt. 293, 19 A.3d 130. The court read Albarelli to list five factors, including: (1) whether the conduct would be considered threatening to a reasonable witness; (2) whether the conduct was directed at a particular person; (3) whether the conduct included only speech or also included a significant physical component; (4) whether the conduct carried a strong implication of imminent harm to the victim; and (5) whether the conduct conveyed the charged level of intent to harm, in this case, recklessness.

¶ 6.    The court considered each of these factors in turn, concluding that each weighed against dismissal. The court found it particularly persuasive that defendant had entered the curtilage of each alleged victim's home, an area that the court noted typically bears a heightened expectation of privacy. The court's decision also placed great weight on the content of the flyers distributed by defendant, reasoning for example that because "the Klan name and imagery, particularly the image of a burning cross, implies impending harm," defendant's conduct carried a strong implication of harm. The court summarized its decision as follows: "[T]he nature of the flyer and placement of the flyer in a part of the complaining witnesses' homes, where the recipients are members of an ethnic group historically targeted for violence by the Klan, results in the conclusion that the Defendant used the flyer as a tool to convey a strong message of intimidation and the potential for harm."

¶ 7.    Following the trial court's denial of his motion to dismiss, defendant entered a conditional guilty plea, reserving the right to appeal the trial court's decision. Defendant was sentenced to concurrent terms of 119 to 120 days, with credit for time served. This appeal followed.

¶ 8. On appeal, defendant raises both facial and as-applied constitutional arguments. He essentially asks this Court to hold that either the disorderly conduct statute reaches only physical behavior, and speech can never serve as the basis for a charge under the statute, or that the statute can reach speech and, as such, either unconstitutionally regulates free speech under the First Amendment or prohibits only unprotected true threats. If the statute does reach true threats, defendant argues that his speech does not convey the imminent harm that defendant argues is necessary to find a true threat under U.S. Supreme Court caselaw.

¶ 9. It is fair to say from the briefing that the parties center their arguments on whether defendant's conduct can be found to involve a true threat such that defendant's speech was not protected by the First Amendment to the U.S. Constitution. The U.S. Supreme Court has held in two main cases that true threats are not constitutionally protected: Watts v. United States, 394 U.S. 705 (1969) (per curiam), and Virginia v. Black, 538 U.S. 343 (2003). Watts is brief and generally provides that speech constituting a true threat is not protected by the First Amendment but offers little explanation of what constitutes a true threat. Watts, 394 U.S. at 707-08. Virginia v. Black provides some more guidance on the definition of a true threat: " 'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." Black, 538 U.S. at 359 (plurality opinion). The decision goes on:

> [A] prohibition on true threats "protect[s] individuals from the fear of violence" and "from the disruption that fear engenders," in addition to protecting people "from the possibility that the threatened violence will occur." Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death. Respondents do not contest that some cross burnings fit within this meaning of intimidating speech, and rightly so. . . . [T]he history of cross burning in this country shows that cross burning is often intimidating, intended to create a pervasive fear in victims that they are a target of violence.

Id. at 360 (quoting R.A.V. v. City of St. Paul, 505 U.S. 377, 388 (1992)).

¶ 10. We cannot decide this case on the constitutional issues raised by the parties unless it is clear that the State has made out a prima facie case that defendant has violated the statute under which he is charged. In arguing the constitutional question, the parties are assuming that a true threat will violate the statute. We must examine this assumption. This method of proceeding is required by our policy to decide cases on nonconstitutional grounds if possible, and to adopt a construction of the statute that avoids constitutional deficiencies. See State v. Read, 165 Vt. 141, 146, 680 A.2d 944, 947 (1996) ("[W]e will not reach challenges based on facial unconstitutionality if there is a readily apparent construction that suggests itself as a vehicle for rehabilitating the statute." (quotation and alteration omitted)).

¶ 11. Defendant is accused of threatening behavior. We have relevant decisions of this Court in two contexts explaining the meaning of "threatening behavior." The first is decisions construing this language in cases brought under the statute before us here, 13 V.S.A. § 1026(a)(1). In construing this statute, we have held that behavior is threatening when it communicates a threat—"[a] threat is a communicated intent to inflict harm on person or property." State v. Cole, 150 Vt. 453, 456, 554 A.2d 253, 255 (1988).

¶ 12. The most recent decision construing this language is State v. Albarelli, in which the defendant was charged with disorderly conduct in violation of 13 V.S.A. § 1026(a)(1). In Albarelli, the defendant was charged under the same prong of the disorderly conduct statute as defendant here—with threatening behavior—after he approached a "Vermonters for Hope" table on the Church Street Mall in Burlington and began "ranting about the Obama candidacy." His hands were in his pockets for most of the time, though occasionally he "gestur[ed] wildly." This behavior lasted for approximately twenty minutes. Albarelli, 2011 VT 24, ¶ 2. The table volunteers testified that they felt threatened and nervous, and that they found the defendant's conduct disruptive.

¶ 13. <u>Albarelli</u> went further than earlier decisions in describing the elements of the crime. We noted that "[d]isorderly conduct statutes have long raised free speech concerns." 2011 VT 24, ¶ 9. To avoid constitutional infirmity "the language of the statute [prohibiting threatening behavior] properly interpreted proscribes conduct, not speech, and therefore does not penalize speech." <u>Id</u>. Further, we held that "threatening behavior" creates an objective standard—whether a reasonable person would conclude a defendant's conduct was threatening—not a subjective standard—whether the recipient of a defendant's allegedly threatening behavior perceived that behavior as a threat. <u>Id</u>. ¶¶ 13-14. Thus, the reaction of the "table volunteers" was irrelevant to whether the defendant committed the crime in <u>Albarelli</u>. Although the decision did not specify required elements of threatening behavior, it relied upon the absence of circumstances that are typically relied upon to find guilt. These include whether the threatening behavior was directed at a particular person, the threatening behavior contained a significant physical component, the strong implication that harm may come to the victim, and a comment or act coupled with an aggressive move toward the victim. <u>Id</u>. ¶¶ 21-23. In concluding that the defendant could not be found guilty of the crime, the Court stated that "[d]efendant did not, however, direct threats against anyone, nor did he physically touch them, attempt to touch them, or threaten to touch them. He did not convey any intent to harm another person." <u>Id</u>. ¶ 24.

¶ 14. In the second context in which we have considered "threatening behavior," we have several times over considered whether a probationer has violated a condition of probation prohibiting him or her from engaging in threatening behavior. One of these cases, decided shortly after <u>Albarelli</u>, in particular defines the contours of expressive conduct as threatening behavior. In <u>State v. Sanville</u>, we held that this probation condition was impermissibly vague as applied to the charged violation in that case. 2011 VT 34, ¶ 10, 189 Vt. 626, 22 A.3d 450 (mem.). The <u>Sanville</u> probationer was in a dispute with the landlord of his mobile home, and the landlord began eviction proceedings. The probationer was charged with violating the threatening behavior condition after

7

he shouted at his landlord, including telling the landlord that he would burn down the mobile home and "kick [landlord and her husband's] butts." Id. ¶ 3 (alteration in original). The probationer did not make any physical gesture toward his landlord, though the landlord did state that the probationer would "start to get huffy." Id. We held that the probationer could not have had notice that his behavior would violate the condition prohibiting threatening behavior because his behavior did not meet our caselaw's standard for threatening behavior—the behavior "did not necessarily 'communicate intent to inflict physical or other harm.' " Id. ¶ 12 (quoting State v. Ashley, 161 Vt. 65, 72, 632 A.2d 1368, 1372 (1993)).

¶ 15. Sanville is particularly significant because the State argued that the probationer had committed the crime of disorderly conduct under 13 V.S.A. § 1026(a)(1) by engaging in threatening behavior, and that this crime constituted the basis for his probation violation. Id. ¶ 12. We rejected that argument, holding that the verbal threats did not violate the statute because the statute proscribes conduct, not speech, citing Albarelli.[2] Id. Sanville is a controlling precedent for the question before us today.

¶ 16. Two other cases addressing the same probation condition are related to Sanville, but neither is helpful to the question before us today. See State v. Johnstone, 2013 VT 57, 194 Vt. 230, 75 A.3d 642 (holding condition prohibiting threatening behavior not violated where probationer was alleged to have violated condition when overheard telling bystander that his probation officer would "end up in a body bag" but statement was not communicated directly to probation officer); State v. Miles, 2011 VT 6, 189 Vt. 564, 15 A.3d 596 (mem.) (holding condition prohibiting threatening behavior not violated because objectively reasonable person would not judge message as serious threat to harm where probationer was charged with violating condition after he told mental health nurse, while he was incarcerated in mental health unit of correctional

---

[2] The dissent finds Sanville unimportant because it is a probation violation case. We disagree. It construes § 1026(a)(1) in a manner directly contrary to the dissent's construction. To adopt the dissent's position, we would have to overrule Sanville.

center, that he intended to kill one Bill Brown who, probationer claimed, "was getting into his head through thoughts and the television").

¶ 17. Johnstone noted that Sanville had not specifically addressed whether pure speech could violate the probation condition, and it refused to answer that question, but nonetheless narrowed the meaning of the condition to apply only to behavior that was intended to put the target of the threat in fear of harm. Id. ¶ 17. It did not address whether defendant's actions could be found to violate the criminal statute, § 1026(a)(1), and is not inconsistent with Sanville.

¶ 18. Miles preceded Sanville. Like Johnstone, it noted that we had not decided whether speech alone could violate the probation condition prohibiting threatening behavior and declined to address that question. 2011 VT 6, ¶ 8. Also as in Johnstone, we concluded that the trial court could not find that the defendant intended to put the target of the threat in fear of bodily harm because the defendant was delusional and there was no evidence that the target existed or that the threat was real. Id. Finally, like Johnstone, Miles did not address whether defendant's verbal threats could be found to have violated the criminal statute, 13 V.S.A. § 1026(a)(1).

¶ 19. There are also relevant and helpful decisions from courts in other jurisdictions. As we explained in Cole, much of the language of § 1026 was derived from § 250.2(1) of the Model Penal Code, including a variant of the "threatening behavior" language.[3] 150 Vt. at 455, 554 A.2d at 255; see also Read, 165 Vt. at 147, 680 A.2d at 948 (noting that "[i]n 1972, the Legislature amended Vermont's 'breach of the peace' statute to follow the 'disorderly conduct' language of

___

[3] The relevant section of the Model Penal Code has language that significantly differs from that enacted by the Vermont Legislature in § 1026(a)(1). The Model Penal Code section provides that a person is guilty of disorderly conduct if, "with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof," the person "engages in fighting or threatening, or in violent or tumultuous behavior." Model Penal Code § 250.2(a). As the dissent acknowledges, the free-standing word "threatening" does not modify the word "behavior" in the Model Penal Code provision as it clearly does in § 1026(a)(1). Without the tie to behavior, we acknowledge that the statement in the Commentary that the statute covers speech alone is consistent with the statutory language. It is the tie to behavior in § 1026(a)(1) that leads to a different result.

9

Model Penal Code § 250.2(1)"). As a result, many states have statutes that use this or similar language to define crimes of disorderly conduct or breach of the peace. See Albarelli, 2011 VT 24, ¶ 9 (noting several states have modeled disorderly conduct statutes after Model Penal Code language and listing examples).

¶ 20. Cases from two states—Oregon and Connecticut—are particularly helpful in addressing the statutory construction issue before us because in both states, the statutory language is identical to that in 13 V.S.A. § 1026(a)(1).[4] In Oregon, the leading case is State v. Cantwell, 676 P.2d 353 (Or. Ct. App. 1984), one of the cases we relied on in Albarelli for the proposition that § 1026(a)(1) criminalizes behavior, not speech. See Albarelli, 2011 VT 24, ¶ 9. The issue in Cantwell was whether the threatening behavior language of the Oregon disorderly conduct statute was overbroad in violation of the Oregon Constitution. 676 P.2d at 356-57. The court held the language was not overbroad, in part by adopting a narrowing interpretation of the statutory language:

> We next consider defendants' contention that [the disorderly conduct statute] is overbroad in violation of [the Oregon Constitution], and, if so, whether a saving construction is possible. A criminal law is overbroad if it purports to reach activities that are constitutionally protected. [The statute] makes it a crime to engage in "fighting or in violent, tumultuous or threatening behavior" with the intent to cause, or recklessly creating a risk of, public inconvenience, annoyance or alarm. Defendants argue that, under certain circumstances, "behavior" could include actual or symbolic constitutionally-protected speech. We do not read the statute to encompass speech in the term "behavior," but construe it to refer only to physical acts of violence. . . . . "[F]ighting" and "violent, tumultuous or threatening behavior" describe physical acts of aggression, not speech, and in prohibiting such physical acts [the statute] does not run afoul of [the Oregon Constitution].
>
> . . . .
>
> We hold that [the statute] makes unlawful only the use of physical force or physical conduct which is immediately likely to produce the

[4] The majority of appellate decisions construing statutory language based at least in part on § 250.2(1) of the Model Penal Code come from these two states.

10

use of such force and which is intended to create or recklessly creates a risk of public inconvenience, annoyance or alarm.

Id. (citations omitted).[5] Since Cantwell, the Oregon courts have consistently ruled that threatening behavior cannot be proven by speech alone. See State v. Hosley, 388 P.3d 387, 389 (Or. Ct. App. 2016) (describing Oregon decisions); State v. Wade, 377 P.3d 660, 663 (Or. Ct. App. 2016); State v. Richardson, 370 P.3d 548, 551-52 (Or. Ct. App. 2016); State v. Kreft, 346 P.3d 1294, 1298 (Or. Ct. App. 2015); State v. Miller, 203 P.3d 319, 321-22 (Or. Ct. App. 2009); State v. Atwood, 98 P.3d 751, 755-56 (Or. Ct. App. 2004); State ex rel. Juvenile Dep't of Union Cty v. Krieger, 33 P.3d 351, 352-53 (Or. Ct. App. 2000).

¶ 21. Hosley is instructive in applying the construction of the Oregon disorderly conduct statute. The defendant in that case, while walking in front of a neighbor's yard, talked with and picked up and hugged the neighbor's seven-year-old daughter and became emotional in doing so. He said he wanted a girl as pretty as her. A day later, the defendant placed a letter on the neighbor's porch, which thanked the neighbor for his understanding in a difficult time, but also included a page containing a "promise," with a signature line for the young girl and a signature line on which the defendant had already signed his name. Above the signature lines, the page set out a promise that "[i]f any boy or older man ever touches my privates or hurts me in any bad way, I promise I will tell my daddy." Hosley, 388 P.3d at 388 (alteration omitted).

¶ 22. The Oregon court held that neither defendant's actions nor his letter met the standard of physical force or physical conduct which is immediately likely to produce the use of physical force. Id. at 390. With respect to the argument that the physical act was the delivery of the letter to the neighbor's porch, the court held:

> [W]e reject the state's contention that the communicative act of leaving a letter can support defendant's disorderly conduct

---

[5] In State v. Begins, we relied upon the second holding of Cantwell that the statute was not void for vagueness. 147 Vt. 45, 48, 509 A.2d 1007, 1009 (1986). That holding also relies upon the narrowing construction of the statute as set out in the text above. See Cantwell, 676 P.2d at 357.

11

conviction. The statute does not reach physical conduct that is actual but incidental to a defendant's speech. We have specifically exempted physical acts that are a common method of gaining someone's attention, such as banging on a door and shouting for someone to open it. When defendant left the letter on T's porch, he engaged in a common method of gaining someone's attention, and that communicative act is not proscribed by [the disorderly conduct statute].

Id. at 389-90 (citations and quotations omitted).

¶ 23.   In Connecticut, the critical decision is State v. Lo Sacco, a case that involves the same disorderly conduct language as 13 V.S.A. § 1026(a)(1) in the context of a domestic violence incident. 531 A.2d 184 (Conn. Ct. App. 1987). The court reached its interpretation of threatening behavior as follows:

"Violent" is defined as "characterized by extreme force" and "furious or vehement to the point of being improper, unjust, or illegal." "Threatening" is defined as a "promise [of] punishment" or, "to give signs of the approach of (something evil or unpleasant)." When two or more words are grouped together, it is possible to ascertain the meaning of a particular word by reference to its relationship with other associated words and phrases under the doctrine of noscitur a sociis. Placed within the context of the other words in the statute, the word "threatening" takes on a more ominous tone. The statute proscribes "engaging in fighting or in violent, tumultuous, or threatening behavior." In State v. Duhan, the Appellate Session of the Superior Court defined "tumultuous" as "riotous" and "turbulent." Fighting, by its plain meaning, involves physical force. We conclude that the language of [the disorderly conduct statute] involved in this case, namely, "violent or threatening behavior," evinces a legislative intent to proscribe conduct which actually involves physical violence or portends imminent physical violence.

Lo Sacco, 531 A.2d at 189-90 (citations and quotations omitted). The reasoning and decision of the court in Lo Sacco was endorsed by the Connecticut Supreme Court in State v. Indrisano in order to hold that the statute as interpreted was not unconstitutionally vague. 640 A.2d 986, 995 (Conn. 1994). In State v. Szymkiewicz, the Connecticut Supreme Court further explained its construction of the disorderly conduct statute by holding that a conviction for threatening behavior could be upheld if the offending conduct was pure speech without a physical component but only

12

if the speech involved "fighting words." 678 A.2d 473, 478 (Conn. 1996). It defined fighting words as "speech that has a direct tendency to cause imminent acts of violence or an immediate breach of the peace. Such speech must be of such a nature that it is 'likely to provoke the average person to retaliation.' " Id. at 478 (quoting Texas v. Johnson, 491 U.S. 397, 409 (1989)); see also State v. Baccala, 163 A.3d 1, 13, 15-16 (Conn. 2017) (reaffirming Szymkiewicz, but holding that customer angrily calling supermarket manager "fat ugly bitch" and "cunt" and saying "fuck you, you're not a manager" was not disorderly conduct because terms were not fighting words).

¶ 24.    The courts in Connecticut and Oregon reached essentially the same statutory construction but for different reasons. The Oregon court adopted a narrowing construction limiting the reach of the statute to improper conduct in order to hold the statute was not vague or overbroad.[6]    The Connecticut court adopted its construction based on normal statutory

---

[6] The dissent's argument that the narrowing construction adopted by the Oregon courts is unnecessary is premised on the unspoken conclusion that the only issue is whether the statute is overbroad. We relied upon the construction of the language in Cantwell to hold that the statute was not void for vagueness with respect to § 1026's prefatory language. See State v. Begins, 147 Vt. 45, 48, 509 A.2d 1007, 1009 (1986) (noting Cantwell held statute not void for vagueness where fighting or violent, tumultuous, or threatening behavior was intended to create or recklessly created risk of public inconvenience, annoyance, or harm). Certainly, our history with respect to the "threatening behavior" language demonstrates continuing concern over the difficulties in interpreting the language. See Johnstone, 2013 VT 57, ¶¶ 20-21 (Dooley, J., concurring). The dissent's solution, to incorporate the true threats doctrine into the statute, makes the interpretation of the statutory language as applied to pure speech even more uncertain. The U.S. Supreme Court has never adopted a comprehensive definition of a true threat, and it is not a term with a historic and well-developed meaning. The U.S. Supreme Court's guidance is limited to a few sentences in Virginia v. Black. Thus, we must look to decisions in other jurisdictions, many of which are conflicting, to develop an adequate definition and scope to apply to individual cases.

A sampling of cases, including some of those cited by the dissent, illustrates this point. For example, in United States v. Turner, the Second Circuit held that a true threat can be both "conditional and inexplicit." 720 F.3d 411, 424 (2013). The court reiterated its own prior precedent to the effect that " 'an absence of explicitly threatening language does not preclude the finding of a threat[,] and, of course, a conditional threat—e.g., 'your money or your life'—is nonetheless a threat.' " Id. (alteration omitted) (quoting United States v. Malik, 16 F.3d 45, 49 (2d Cir. 1994)).

In contrast, the Third Circuit has interpreted Watts v. United States to require that a true threat be unconditional. That court, writing six years after Virginia v. Black, cited Watts for the premise that "while advocating violence that is not imminent and unlikely to occur is protected,

13

interpretation methodology, although the Connecticut Supreme Court in Indrisano adopted the construction in part to respond to a vagueness challenge to the statute. We agree with both rationales for reaching this construction.

¶ 25. There is also a third reason for us to adopt this construction. As we noted in Cole, § 1026 is really "a criminal public nuisance statute." 150 Vt. at 455-56, 554 A.2d at 255. This is

---

speech that constitutes a 'true threat' is not." United States v. Fullmer, 584 F.3d 132, 154 (2009) (citing Watts, 394 U.S. at 708). This language suggests that speech loses constitutional protection under the doctrine of true threats only if the speech conveys a threat both imminent and likely to occur. This reading is supported by the Fullmer court's decision, which examined the context of the threats at issue in that case and concluded that "[d]efendants used past incidents to instill fear in future targets," and "given the success of the campaign in the past, including the destruction of private property and the telecommunication attacks on various companies, the implied threats were not conditional, and this speech rightly instilled fear in the listeners." Id. at 156 (emphasis added). As the court explained, the defendants' actions met "the standard of a 'true threat' as articulated in Watts." Id.

Fullmer does not cite or discuss Black in its true threats analysis. Indeed, not all recent U.S. Supreme Court First Amendment cases list true threats among the categories of unprotected speech. In United States v. Stevens, the Court was asked to rule that depictions of animal cruelty were a categorically unprotected class of speech. 559 U.S. 460 (2010). The Court wrote that:

> From 1791 to the present, . . . the First Amendment has permitted restrictions upon the content of speech in a few limited areas, and has never included a freedom to disregard these traditional limitations. These historical and traditional categories long familiar to the bar—including obscenity, defamation, fraud, incitement, and speech integral to criminal conduct—are well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem.

Stevens, 559 U.S. at 468-69 (quotations, citations, and alterations omitted); see also Brown v. Entm't Merchs. Ass'n, 564 U.S. 786, 791 (2011) (listing limited areas of unprotected speech "such as obscenity, incitement, and fighting words" (citations omitted)). But see United States v. Alvarez, 567 U.S. 709, 717-18 (2012) (citing Watts and including true threats among categories of unprotected speech). We do not read too much into the Court's omission of true threats in the language above. The point is simply that this omission coupled with at least one circuit's reliance on Watts rather than Black for the definition of a true threat supports construing § 1026(a)(1)'s threatening behavior provision such that the statute avoids the constitutional question.

The situation here is much different from that in Read, 165 Vt. at 148, 680 A.2d at 948, which narrowed the term "abusive language" in 13 V.S.A. § 1026(3) to fighting words, a well-developed and understood concept in American law.

shown by the statute's element of "public inconvenience, or annoyance," the statute's placement in the Chapter on "Breach of the Peace; Disturbances," 13 V.S.A. Ch. 19, and the name of the crime as "Disorderly Conduct." Thus, the statute's intent is less about protecting individuals from threats and more about protecting the public from breaches of the public order caused by threats.

¶ 26. In fact, Vermont has a general criminal statute that defines a misdemeanor crime of threats of violence to persons, but defendant was not charged under it.[7] Section 1702 of Title 13 is entitled "Criminal threatening" and provides:

_____

[7] This statute became effective on July 1, 2016. See 2015, No. 162 (Adj. Sess.), §§ 6b, 7. Because defendant was not charged under this statute, and, given the timing of the charge in this case and § 1702's enactment date, could not have been charged under this statute, we do not address whether the State has shown a prima facie case that defendant violated it. We are unwilling also to speculate, as the dissent does, that this statute is too narrow to cover threats to the public. We note, for example, that a threat to explode a bomb in a shopping mall is a threat to harm the persons who are in it when the threat is made. Further, § 1702 indicates that the Legislature is less concerned with a threat that the person who utters it cannot carry out. The inability to carry out the threat is an affirmative defense under the statute. See 13 V.S.A. § 1702(f). What the dissent sees as an unexplained gap in coverage may be a legislative decision not to extend the coverage as far as the dissent would want.

Likewise, the "mixed bag" that the dissent sees in the Legislature's use of the words "threat" and "threatening behavior" across several statutes, post, ¶ 44, may actually indicate that these terms are used consistently across statutes. Three of the statutes discussed by the dissent use the word "threat" rather than "threatening behavior," and each of these three references can be understood to refer to a pure speech threat, with no accompanying physical conduct. First, 13 V.S.A. § 1027(a) provides that a person commits the offense of disturbing the peace by use of telephonic or other electronic communication if the person, "with intent to . . . threaten . . . makes contact by means of a telephone or other electronic communication with another and . . . threatens to inflict injury or physical harm to the person or property of any person." Given that this statute's reach is limited to threats conveyed by either telephone or electronic communication—i.e., through media that by its nature is not dependent on in-person contact between perpetrator and subject—it would be illogical to require a physical component to a threat for purposes of this statute. Thus, this statute's reference to threats rather than threatening behavior is consistent with our interpretation of threatening behavior under § 1026(a)(1).

Second, as discussed above, 13 V.S.A. § 1702(a) refers solely to threats, and not to threatening behavior. And since the Legislature saw fit to expressly limit the application of this statute to stay within the confines of the First Amendment, see id. § 1702(d)(2), it is reasonable to conclude that § 1702's reference to threats is meant to address threats conveyed through speech without accompanying physical conduct. Thus, § 1702 is also consistent with our interpretation of threatening behavior under § 1026(a)(1). Finally, 13 V.S.A. § 1026a refers to both threats and threatening behavior, which supports the conclusion that these two terms have two different

15

(a) A person shall not by words or conduct knowingly:
    (1) threaten another person; and
    (2) as a result of the threat, place the other person in reasonable apprehension of death or serious bodily injury.
(b) A person who violates subsection (a) of this section shall be imprisoned not more than one year or fined not more than $1000.00, or both.

The statute goes on to define serious bodily injury as bodily injury that creates "a substantial risk of death, . . . a substantial loss or impairment of the function of any bodily member or organ; . . . a substantial impairment of health; . . . or substantial disfigurement." Id. § 1702(d)(1) (incorporating definition of serious bodily injury in 13 V.S.A. § 1021(a)(2)). It also provides that " '[t]hreat' and 'threaten' shall not include constitutionally protected activity." Id. § 1702(d)(2).

¶ 27. Our point is that a construction of § 1026(a)(1) that limits the statute's coverage to threatening conduct and doesn't cover threatening speech does not leave our law without a crime for speech that threatens personal violence. Indeed, the Legislature may have enacted § 1702 based on a concern that the disorderly conduct statute would not prohibit pure speech. Thus, § 1702 specifically addresses threatening speech and acknowledges that such a crime can extend only as far as the First Amendment allows. The presence of this statute is an indication that "threatening behavior," as criminalized in § 1026(a)(1) should not extend to threatening speech.

¶ 28. Although the Connecticut court did not rely on this rationale for its decision to construe the threatening behavior statutes to include threatening speech, we note that the same situation applies in Connecticut. The Connecticut Legislature has enacted statutes that criminalize speech that threatens violence to a person, and these statutes have been challenged as inconsistent with the First Amendment. See Conn. Gen. Stat. Ann. § 53a-181(a)(3) ("A person is guilty of a breach of the peace . . . when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person . . . "threatens to commit any crime against another

---

meanings. Again, this statute is consistent with our reading of threatening behavior under § 1026(a)(1).

person or such other person's property"). The Connecticut court has held that these statutes can be applied only to true threats to stay within constitutional limits. See State v. Krijger, 97 A.3d 946, 956 (Conn. 2014) (holding that conviction under § 53a-181(a)(3) requires state "to prove beyond a reasonable doubt that [the defendant's] statements represented a true threat"). The Connecticut court has not recognized a true-threat requirement with respect to charges of threatening behavior because that charge under the Lo Sacco construction of the language does not involve speech.[8] Id.

¶ 29. For the reasons stated in Cantwell and Lo Sacco, as well as adherence to our own precedent in Sanville, we adopt the construction of the term "threatening behavior" in those cases. We provide the following explanations of this construction's application.

¶ 30. In Albarelli, we held that the disorderly conduct statute proscribing threatening behavior "proscribes conduct, not speech, and therefore does not penalize speech." 2011 VT 24, ¶ 9. In a later paragraph, however, we relied upon a Massachusetts decision to state "[l]anguage may be treated as a threat to harm a victim, even in the absence of an explicit statement to do so, 'as long as circumstances support the victim's fearful or apprehensive response.' " Id. ¶ 20 (quoting Commonwealth v. Chou, 741 N.E.2d 17, 22 (Mass. 2001)). These statements are at least arguably inconsistent, particularly if the latter is interpreted to apply when the "threatened behavior" is entirely or primarily speech. We clarify the statement that speech can be relevant to explain whether threatening behavior has occurred but only where the behavior is physical conduct and not speech. Oregon cases explain this use of speech. See Richardson, 370 P.3d at 551-52 (explaining that Oregon statute "does not reach physical conduct that is actual but incidental to speech," including speech that is "a common method of gaining someone's attention" (quotation omitted)). For example, a person using one hand to punch the other hand is more likely to be

---

[8] After Szymkiewicz, speech can be "threatening behavior," but only if it contains fighting words, a requirement different from a true threat. As we explain in the text, we do not adopt this requirement.

17

engaging in threatening behavior if the physical activity is accompanied by threatening statements than if not.

¶ 31.  We do not adopt the holding of Szymkiewicz that threatening behavior can be composed of fighting words despite the fact that the behavior is uttering speech.  In Read, 165 Vt. at 148, 680 A.2d at 948, we adopted a construction of the "abusive language" language prong of 13 V.S.A. § 1026(a)(3) that limits the statute's reach to "fighting words" as defined in Chaplinsky v. New Hampshire, 315 U.S. 568 (1942).  More recently, in State v. Tracy, we questioned the continued vitality of the fighting words exception.  2015 VT 111, ¶¶ 16-17, 200 Vt. 216, 130 A.3d 196.  Thus, we further narrowed the reach of § 1026(a)(3):

> For these reasons, if § 1026(a)(3) has any continuing force, it is necessarily exceedingly narrow in scope.  The use of foul language and vulgar insults is insufficient.  A likelihood of arousing animosity or inflaming anger is insufficient.  The likelihood that the listener will feel an impulse to respond angrily or even forcefully is insufficient.  The provision only reaches speech that, in the context in which it is uttered, is so inflammatory that it is akin to dropping a match into a pool of gasoline.

Id. ¶ 38.  Even if the fighting words doctrine has continuing vitality, we would not apply it to the threatening behavior prong of § 1026, which has a different scope and purpose than the "abusive language" prong.

¶ 32.  The definition of violent or threatening behavior in the Oregon cases—"physical force or physical conduct which is immediately likely to produce the use of such force"—is very similar to that in the Connecticut cases—"physical violence or portends imminent physical violence."  We adopt the Oregon definition, with our explanation that speech can be introduced to explain or provide context for physical conduct.

¶ 33.  We turn now to the trial court's decision on defendant's motion to dismiss.  We apply the standard for a prima facie case pursuant to V.R.Cr.P. 12(d)(2).  See supra, ¶ 5; State v. Hutchins, 2005 VT 47, ¶ 6, 178 Vt. 551, 878 A.2d 241 (mem.) (we "determine whether the State met its burden in demonstrating that it had substantial, admissible evidence as to the elements of

18

the offense challenged by the defendant's motion" and "we view the evidence in the light most favorable to the State, and exclude modifying evidence, to determine if the evidence can fairly and reasonably establish defendant's guilt beyond a reasonable doubt" (quotation omitted)). Since defendant's leaving of the flyers at the homes of the two women constituted speech and not nonspeech behavior, it does not fall within the disorderly conduct statute, 13 V.S.A. § 1026(a)(1), which criminalizes conduct that is not speech. The trial court answered the need for a physical threat by relying on the fact that defendant entered the curtilage of the alleged victims' homes and placed the flyer in the recipients' mailbox or between their doors. We agree with the decision in Hosley that a method of delivery that is incidental to the speech alleged to be the threat cannot meet the requirement for physical conduct. See 388 P.3d at 389-90.

¶ 34. Further, even if the statute could be violated by pure speech, the charged conduct would also need to convey the imminent threat of harm, which the conduct in this case does not. The flyer is a recruitment solicitation—its overt message is to join the Ku Klux Klan. It contains no explicit statement of threat. To the extent it conveys a message of personal threat to the recipient, it is that the Klan will recruit members and inflict harm in the future. The flyer itself is not "immediately likely to produce" force and harm. Cantwell, 676 P.2d at 357.

¶ 35. For the above reasons, we hold that the State has not demonstrated that it has a prima facie case that defendant violated 13 V.S.A. § 1026(a)(1). The State's evidence cannot establish defendant's guilt beyond a reasonable doubt. The motion to dismiss the two disorderly conduct charges must be granted.

¶ 36. We need not reach whether defendant's conduct included a true threat. Even if defendant's speech contained a true threat, it would not violate the statute under which defendant was charged as we have construed that statute here and as explained above. In reaching this conclusion, we do recognize that any communication from the Ku Klux Klan complete with symbols of the Klan, particularly the burning cross, would raise concern and fear in a reasonable

19

person who is a member of an ethnic or racial minority. We are not ruling today whether the Legislature can make criminal such action or has done so in a different statute. Our ruling today is only that defendant's conduct does not violate the specific statute under which he was charged, 13 V.S.A. § 1026(a)(1).

¶ 37. Because of our decision dismissing the disorderly conduct charges against defendant, we also need not reach the issues related to the hate-motivated sentence enhancement provided by 13 V.S.A. § 1455.

Reversed.

FOR THE COURT:

_____
Associate Justice

¶ 38. **ROBINSON, J., dissenting.** Although I am sympathetic to the goal of narrowing a criminal statute to avoid constitutional infirmity, I believe the majority's construction of the term "threatening behavior" is excessively narrow because it precludes prosecution for a serious expression of an intent to commit acts of unlawful violence to a particular individual or group of individuals uttered in public with an intent to cause public inconvenience or annoyance if that threat is unaccompanied by a physical gesture. I would construe the definition of "threatening behavior" in the statute to reach a communication of an intent to inflict physical or other harm— even that which takes the form of threatening words unaccompanied by a physical motion beyond the act of speaking—to the extent that in its overall context such threatening behavior, including its expressive component, is not constitutionally protected. Our standard of review at this stage of the proceedings is significant. The question for us on appeal is not how this Court construes the evidence but whether a reasonable jury could find defendant guilty if it viewed the record evidence, and the inferences from that evidence, in the light most favorable to the State. Given the combination of three critical factors—that the communications in this case were targeted

20

exclusively at two minority residents in a predominantly white, nonhispanic neighborhood, they invoked powerful symbols of violence against racial and ethnic minorities, and they were placed inside or next to the screen doors of two targeted individuals' homes—a reasonable and properly instructed jury could conclude that the threats in this case were not constitutionally protected. Accordingly, I would affirm.

### I. In Some Contexts Stated Threats Can Constitute "Threatening Behavior" Under 13 V.S.A § 1026(a) Consistent with the Legislature's Intent and the First Amendment

¶ 39.    The majority's conclusion that the "threatening behavior" prong of the disorderly conduct statute reaches only physical actions,[9] and that any accompanying words are relevant only insofar as they provide insight as to the meaning of the physical actions, is not supported by our own prior caselaw, the plain language of the statute, the statutory scheme more broadly, the Legislature's intent, or the constitutional imperative driving the majority's construction.

¶ 40.    In prior cases, our focus in assessing threatening behavior has not been the presence or absence of a physical component but the presence or absence of a " 'communicated intent to inflict physical or other harm.' " State v. Sanville, 2011 VT 34, ¶ 9, 189 Vt. 626, 22 A.3d 450 (quoting State v. Ashley, 161 Vt. 65, 72, 632 A.2d 1368, 1372 (1993)); see State v. Cole, 150 Vt. 453, 456, 554 A.2d 253, 255 (1988) (describing "[t]hreatening behavior" as "behavior that

---

[9] I am deliberately avoiding the terms "speech" and "conduct" in my discussion, as I find the speech-conduct distinction as sometimes articulated unhelpful and circular. See, e.g., R.A.V. v. City of St. Paul, 505 U.S. 377, 386 (1992) ("In other words, the exclusion of 'fighting words' from the scope of the First Amendment simply means that, for purposes of that Amendment, the unprotected features of the words are, despite their verbal character, essentially a 'nonspeech' element of communication."); Cohen v. California, 403 U.S. 15, 27 (1971) (Blackmun, J., dissenting) (describing defendant's wearing a jacket bearing the words "fuck the draft" as "mainly conduct and little speech"). When some courts and commentators describe words that can be proscribed consistent with the First Amendment as "conduct," the label takes on the character of a legal conclusion rather than an empirical description. See generally, Eugene Volokh, Speech as Conduct: Generally Applicable Laws, Illegal Courses of Conduct, "Situation-Altering Utterances," and the Uncharted Zones, 90 Cornell L. Rev. 1277, 1347-48 (July 2005) (describing various rationales courts and commentators have used to describe speech as "conduct" on the basis of its content and arguing that the only sustainable speech-conduct distinction is that between the communicative and noncommunicative aspects of speech).

21

communicates the requisite intent" to "inflict harm on person or property"). We have considered conduct's "physical component" in assessing whether the conduct was threatening, and frequently we have found physical actions to communicate threatening intent.

¶ 41. For example, in State v. Albarelli, we considered a disorderly conduct charge against a defendant who had engaged in a loud, agitated, and prolonged rant on a public pedestrian way by a table where individuals were promoting the presidential campaign of then-candidate Barack Obama. 2011 VT 24, ¶¶ 2-6. We concluded that the evidence was insufficient to support a conviction for "threatening behavior" because the behavior did not convey an intent to do harm to another person. Id. ¶ 18. We recognized that "[l]anguage may be treated as a threat to harm a victim, even in the absence of an explicit statement to do so, as long as circumstances support the victim's fearful or apprehensive response" from the perspective of a reasonable person. Id. ¶¶ 14, 20 (quotation omitted). We identified factors to consider in determining whether a defendant has engaged in "threatening behavior," including whether the defendant made targeted threats to a specific person or made threatening physical gestures. Id. ¶ 21. Noting that the defendant in that case had not made any explicit threats to harm any other person, his conduct was not directed at any person in particular, and his conduct lacked any "physical component" beyond gesticulating, this Court concluded that the evidence did not support the charge that he had engaged in threatening behavior. Id. ¶¶ 22-25. Although we considered the presence or absence of physical gestures as a factor in determining whether defendant engaged in "threatening behavior," we recognized that the critical consideration was the effect of defendant's behavior on a reasonable listener. Physical gestures are undoubtedly relevant to a reasonable assessment of the situation, but we have never said that the physical component, or its absence, is dispositive. Rather, we have

22

focused on the overall context—including the words spoken, the context in which they were spoken, and any accompanying physical actions—to assess the threat.[10]

¶ 42.  To the extent that they are relevant, our probation condition cases reinforce this conclusion.[11]  In State v. Johnstone, we noted that there was "no allegation that defendant knew that the target of his statements was within earshot" and concluded, without any discussion of the presence or absence of a physical component, that facts did not indicate "defendant intended to put his probation officer in fear of harm or to convey a message of actual intent to harm her."  2013 VT 57, ¶¶ 17-18, 194 Vt. 230, 75 A.3d 642.  In State v. Sanville, we recognized that this Court had not yet decided whether verbal threats can constitute threatening behavior in the context of probation conditions.  2011 VT 34, ¶ 7, 189 Vt. 626, 22 A.3d 450.  However, we did not then decide the issue, and, as noted above, we applied a standard that defined "threat" as a "communicated intent to inflict physical or other harm" and "threatening behavior" as "behavior that communicates the requisite intent."  Id. ¶ 9 (concluding that probationer did not have sufficient notice that his heated arguments, in which he "mouthed off" inappropriately, would be deemed to be violent and threatening behavior).[12]  Likewise, in State v. Miles, we declined to reach the question because the defendant in that case was being held in the mental health unit of a state correctional facility, made statements that suggested that he was delusional, and threatened to kill

---

[10] For that reason, I find the majority's attempt to reinterpret Albarelli unpersuasive.  Ante, ¶ 30.  The Court's recognition in that case that "[l]anguage may be treated as a threat to harm a victim" makes total sense when the harm targeted by the statute is the impact of the threat.

[11] The purpose of the disorderly conduct statute—protecting against a public disturbance— is different from that of a probation condition—promoting individual rehabilitation.  But insofar as one issue in probation condition cases is whether the prohibition of "threatening behavior" gives ample notice of what is proscribed, our understanding of "threatening behavior" in the probation condition context could be illustrative.

[12] The majority suggests that in Sanville this Court held that verbal threats do not violate § 1026(a)(1).  I respectfully disagree.  The Court in Sanville concluded that the particular threats at issue in that case did not amount to "violent and threatening behavior" but did not state that threats of violence communicated through words unaccompanied by physical gestures can never run afoul of § 1026(a)(1).

someone who may or may not have actually been a real person. 2011 VT 6, ¶ 8, 189 Vt. 564, 15 A.3d 596.

¶ 43. Our decisions have been faithful to the plain language of the statute. The everyday meaning of "threatening behavior" includes making serious threats to cause imminent bodily harm. Common usage supports the understanding that "threatening behavior" includes standing in the middle of a crowded pedestrian way and asserting loudly and repeatedly, to nobody in particular but in a way that reasonably gives rise to fear of bodily harm, that you will detonate a pipe bomb if people don't stop and listen. See State v. Therrien, 2011 VT 120, ¶ 9, 191 Vt. 24, 38 A.3d 1129 ("When interpreting a statute our goal is to give effect to the intent of the Legislature, and to do so we first look at the plain, ordinary meaning of the statute." (quotation omitted)). In construing the statute, we ought not lose sight of this common sense understanding. At most, the Legislature's use of the term "threatening behavior" is ambiguous; it is by no means clear that it is limited to physical actions that convey a threat, as opposed to the expression of words that do the same. It may well be intended to expand the reach of the statute by including threats that are inferred from actions rather than exclusively threats that are communicated through words.

¶ 44. On balance, the statutory scheme likewise supports the view that "threatening behavior" can describe communicated threats unaccompanied by physical gestures, although I acknowledge that it's a mixed bag. On the one hand, the Legislature has expressly prohibited threats in several statutes without describing the offense as "threatening behavior." See, e.g., 13 V.S.A. § 1027(a) (prohibiting disturbing the peace by electronic communications including threats "to inflict injury or physical harm to the person or property" of another with intent to "terrify, intimidate, threaten, harass, or annoy); id. § 1702(a) (prohibiting criminal threatening, defined as knowingly threatening another person and "plac[ing] that person in reasonable apprehension of death or serious bodily injury"); id. § 1026a(a) (prohibiting aggravated disorderly conduct offense including both "threatening behavior" and threats of "bodily injury or serious bodily injury" if

24

threats or threatening behavior are undertaken as course of conduct with intent to cause person "inconvenience or annoyance, or to disturb the person's peace, quiet, or right of privacy").[13]

¶ 45.    On the other hand, in prohibiting attempts "by physical menace to put another in fear of imminent serious bodily injury" the Legislature has expressly identified a "physical action" requirement when it has sought to address threats conveyed through physical actions.  Id. § 1023(a)(3); see also Graham v. State, 2006-KA-00518-COA (¶ 16), 967 So. 2d 670, 675 (Miss. Ct. App. 2007) ("Physical menace demands something more than words."); Ickes v. Ickes, No. 89-S-520, 1989 WL 223538, at *2 (Pa. Com. Pl.) ("A 'menace' is a threat.  A physical menace

---

[13]   In 2014, the Legislature established the offense of "aggravated disorderly conduct," codified at 13 V.S.A. § 1026a.  2013, No. 150 (Adj. Sess.), § 4.  This new offense is directed at many of the actions listed in § 1026, but rather than requiring that they be undertaken with an intent to cause "public inconvenience or annoyance" or recklessly create a risk thereof, the offense targets several of the same actions as the disorderly conduct statute—fighting, violent, tumultuous or threatening behavior, unreasonable noise, etc.—when undertaken as a course of conduct with the intent to cause a specific person "inconvenience or annoyance," or "to disturb the person's peace, quiet, or right of privacy." 13 V.S.A. § 1026a.  Although the aggravated disorderly conduct offense tracks many of the elements of the regular disorderly conduct statute, it includes an additional prong applicable when, with the requisite intent, the actor "threatens bodily injury or serious bodily injury, or threatens to commit a felony crime of violence." Id. § 1026a(a)(4).  The addition of this language might suggest that the Legislature in 2014 believed that the existing disorderly conduct statute, § 1026, did not reach "threats," but the legislative history does not bear this out.

The "threat" element of § 1026a(a)(4) got scant attention through House and Senate committee hearings, and nobody in either committee testified that the language was added to expand the limited reach of the "threatening behavior" prong.  Instead, the primary goal of the new offense was to create an offense with greater penalties than the disorderly conduct statute to address behavior that may not meet all the elements of stalking but is nonetheless targeted at an individual and involves a course of harassing conduct.  The penalty for violating the new statute is up to 180 days imprisonment or a $2000 fine—more than three times the incarcerative penalty for ordinary disorderly conduct, first offense, and four times the financial penalty.  If anything, the legislative history suggests a desire to provide the State a broad range of tools, consistent with constitutional limitations, to combat behavior on the harassment-threat spectrum.  See generally 2013, No. 150 (Adj. Sess.), Hearings on S.195 Before Senate Judiciary Comm. and House Judiciary Comm. (Vt. Feb. 19, 27, 2014, Apr. 11, 2014, May 30, 2014).

therefore would be a physical threat as opposed to a verbal threat directed toward a victim." (citation omitted)).[14]

¶ 46. The reason I conclude that the statutory scheme as a whole supports the view that the disorderly conduct statute reaches some threats that are unaccompanied by physical gestures if made with the intent to cause public inconvenience or annoyance is that a contrary construction would leave a major gap in the statutory scheme. Under the majority's view, as the majority notes, Vermont law does prohibit threats against a specific individual without regard to the presence or absence of physical gestures accompanying the threats. See ante, ¶ 26-27. The private interest in freedom from targeted threats may be amply protected by other statutes besides 13 V.S.A. § 1026. See 13 V.S.A. §§ 1026a, § 1027, § 1702. In fact, these other statutory provisions are arguably far better suited than § 1026 to address defendant's alleged conduct in this case. But in the context of threats to the public generally, communicated in words with the requisite intent to cause the kinds of public disruptions targeted by the disorderly conduct statute, the majority's construction leaves the State with no tools for regulating, say, the hypothetical shouted threat to detonate an explosive in the middle of a crowded pedestrian mall.[15] I find it hard to believe that the Legislature has so comprehensively regulated private threats, and has broadly proscribed public nuisances, but intended to exempt from prosecution all generalized public threats unaccompanied by physical

---

[14] In State v. Gagne, we upheld on plain error review a jury instruction that described the threat required for "physical menace" to be "a threat, by word or act, to inflict physical injury upon a person." 2016 VT 68, ¶¶ 29-32, 202 Vt. 255, 148 A.3d 986. The threat in that "road rage" case arose from the defendant's chasing the victims through town, eventually pulling up next to their truck and pointing a rifle at them, and the defendant's challenge on appeal focused on whether the jury instruction properly required the jury to assess the threat of the "physical menace" from the perspective of a reasonable person. We did not discuss or rule on the trial court's instruction suggesting that words could amount to a "physical menace."

[15] If a defendant actually possesses such a weapon, this action would support a charge of aggravated assault with a deadly weapon pursuant to 13 V.S.A. § 1024(a)(5). However, this charge is only applicable if the defendant is actually armed with such a weapon.

26

gestures, without regard to the seriousness of the threat, the context in which it is communicated, or the intended public disruption underlying the threat.

¶ 47. The legislative intent underlying § 1026 supports this view. As we have previously noted, § 1026 is really a "criminal public nuisance statute." State v. Cole, 150 Vt. 453, 455-56, 554 A.2d 253, 255 (1988). The statute is based, to a large extent, on the Model Penal Code § 250.2. We have recognized that "[w]hen our statute is taken from a model act, it is often helpful to examine the intent behind the model act." State v. Papazoni, 159 Vt. 578, 581, 622 A.2d 501, 503 (1993). The focus of the Model Penal Code disorderly conduct provision is "those who are consciously indifferent to the public peace and tranquility," which is the ultimate target of the provision. Model Penal Code § 250.2 Commentaries (Am. Law Inst., Official Draft and Revised Comments 1980). With respect to the prohibition of threatening in the Model Penal Code, the official commentary explains:

> Because the concept of threatening is not otherwise defined, this aspect of the offense reaches any kind of threat, whether verbal or physical, that creates risk of public inconvenience, annoyance, or alarm. This coverage is broader than [the section of the Model Code that] proscribes as a form of assault attempting "by physical menace to put another in fear of imminent serious bodily injury." The disorderly conduct provision contains no such limitation on the kinds of threats covered, but that breadth is balanced by the requirement of purpose or recklessness with respect to creation of a public nuisance. Again, the differences between disorderly conduct and assault reflect the different rationales of the two offenses and the distinct harms at which they are aimed.

Id. cmt. 3 at 331.

¶ 48. There can be no doubt that the Model Penal Code, upon which our disorderly conduct statute is based, reaches public disruption arising from threatening words. To the extent that a threat of harm, whether communicated through words, gestures, or both, can be quite

disruptive to public order, it falls squarely within the universe of harms the Vermont Legislature intended to address with the disorderly conduct prohibition.[16]

¶ 49.  By contrast, the majority's approach—focusing on the presence or absence of physical movement—hones in on the wrong factor.  The public harm from threatening behavior does not arise from a defendant's gesticulating while engaging in a threatening tirade; it flows from the threatening tirade itself.  Excluding from the statute's reach those public threats that are communicated in words without the accompanying gesticulation would frustrate the purpose of the statute.

¶ 50.  Most important, I believe the majority's approach to narrowing the statute is both overinclusive and underinclusive relative to the constitutional considerations that motivate the majority to narrow the statute in the first place.  Even though the majority's interpretation is at odds with our caselaw and the statutory language, scheme, and purpose for the reasons set forth above, I might join in the majority's attempt to narrow the scope of the statute if its construction made sense as a way of avoiding conflict with the First Amendment.  But by narrowing the statute based on a factor that has little to do with the underlying purposes of the statute or the relevant

---

[16] The relevant section of the Model Penal Code provides that a person is guilty of disorderly conduct if, "with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof," the person  "engages in fighting or threatening, or in violent or tumultuous behavior."  Model Penal Code § 250.2(a).  Our statute prohibits actions undertaken with a similar purpose—although we exclude an intent to cause public "alarm" from the intent element—and directs the analogous prong of the statute at "engag[ing] in fighting or in violent, tumultuous, or threatening behavior."   13 V.S.A. § 1026(a)(1).   One can imagine various explanations for the Vermont Legislature's rewording of the Model Penal Code language to refer to "threatening behavior" as opposed to using the term "threatening" as a gerund.  Perhaps, consistent with the majority's opinion, the Legislature adopted the phrase "threatening behavior" in order to limit the universe of threats subject to prosecution to only those communicated through physical actions.  Alternatively, and equally plausibly, the Legislature may have intended to be more expansive than the Model Penal Code by providing that the threats in question may be communicated by means other than words alone—including by physical gestures or some combination of words and physical actions.  Or perhaps the Vermont Legislature adopted different phraseology because it found the Model Penal Code language clunky, with no intent to substantively depart from the Model Penal Code's description of the scope of the offense.  In the absence of any evidence resolving this question, I cannot ascribe significance to the difference in wording between the Vermont statute and the Model Penal Code provision on which it is based.

constitutional considerations, the majority has defined out of the statute's reach much behavior that can constitutionally be prohibited, and that the Legislature intended to include, while simultaneously leaving considerable room for constitutional conflict in cases in which a threat is conveyed through expression other than words.

¶ 51.    The U.S. Supreme Court has long recognized that some threatening speech may be prohibited without offense to the First Amendment.  In Watts v. United States, the Court upheld a constitutional challenge to a statute prohibiting threats against the life of the President of the United States.  394 U.S. 705, 706 (1969).  Consistent with "the commands of the First Amendment," the Court explained that in applying the statute a court must distinguish a threat from constitutionally protected speech.  Id.  It concluded that a protester's conditional statement that if he was drafted to serve in the war he would shoot the President was, in context, political hyperbole and not a true threat.

¶ 52.    More recently, in Virginia v. Black, the Court reaffirmed that among the categories of expression states may regulate consistent with the Constitution are "true threats," defined to "encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." 538 U.S. 343, 359 (2003) (plurality opinion).  The Court explained that a speaker "need not actually intend to carry out the threat," because the prohibition on true threats "protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur."  Id. at 360 (quotations and alteration omitted).  Considering a statute proscribing intimidation through cross burning, the Court said, "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death."  Id.  The Court declined to strike down the statute insofar as it prohibited cross burning with the intent to intimidate, although it did strike down

29

convictions under the statute on account of a provision in the statute that the fact of cross burning alone is facial evidence of an intent to intimidate.

¶ 53. State and federal courts have relied on this test in construing statutes that criminalize threats, and in evaluating their constitutionality. See, e.g., United States v. Turner, 720 F.3d 411, 421 (2d Cir. 2013) (affirming defendant's conviction for threatening judges online where evidence was sufficient to show that his statements were not "political hyperbole," but violent threats against the judges lives); United States v. Parr, 545 F.3d 491, 493 (7th Cir. 2008) (affirming defendant's conviction for threatening to blow up federal building where he described his plans in great detail and had history of building bombs and supporting terrorism); In re Robert T., 2008 WI App 22, ¶¶ 18-19, 746 N.W.2d 564 (evaluating statute prohibiting bomb scares, holding that "true threats" are not limited to those directed at specific person or group of people and threatening bodily harm or death); State v. DeLoreto, 827 A.2d 671, 679, 686 (Conn. 2003) (concluding that in context, defendant's threats to "kick your punk ass" to two different police officers constituted true threats subject to prosecution under statute prohibiting breach of peace).

¶ 54. The majority's holding precludes prosecution under the disorderly conduct statute for a large swath of true threats that the Legislature can permissibly prohibit consistent with the First Amendment and which, as argued above, the Legislature intended to proscribe. In particular, the majority removes from the disorderly conduct statute true threats communicated without an accompanying physical gesture, even if the other elements of the disorderly conduct statute are satisfied. Its construction of the statute is far narrower than required by the First Amendment, to the detriment of the State's ability to regulate public disturbances occasioned by true threats.

¶ 55. At the same time, the majority's holding does little to address the serious constitutional questions that may arise even when a threat is communicated through physical gestures alone, or in combination with words. What makes a threat threatening—whether it is communicated through words, physical actions, or some combination of the two—is the substance

and credibility of the communication itself. Even if the State could only prosecute gestures or physical acts as "threatening behavior," it's the expressive content of the gestures or acts that make them threats. See, e.g., Cole, 150 Vt. at 456-67 (noting that defendant's "act of grabbing the flashlight could be found to be threatening behavior, done to communicate the intent to harm"). Prosecuting someone who delivers a Ku Klux Klan recruitment flyer with a threatening gesture raises First Amendment concerns, notwithstanding the physical action accompanying the written communication. Ultimately, what matters—both from the perspective of the goals of the statute and from the perspective of the First Amendment—is what is communicated by the gesture, words, or combination thereof—and whether that communication falls within or outside of the protection of the First Amendment. A raised fist can communicate a threat, but may also act as symbolic speech. Although the majority succeeds in avoiding these constitutional questions in this case, its analysis makes them no less inevitable.

¶ 56. In sum, the focus of the disorderly conduct statute is not the physical movements that convey or accompany the communication of threats; it's the threats themselves. And the exception to the U.S. Constitution's protection of free speech is based on the meaning and significance of the threats themselves, not the manner in which they are communicated. The factor relied upon by the majority to limit the scope of § 1026 accomplishes the goal, in this case, of avoiding difficult constitutional questions, but does so by relying on a factor that has little to do with anything. For these reasons, I cannot join the majority's construction of § 1026.

II. "Threatening Behavior" Encompasses "True Threats"

¶ 57. To narrow the statute against a facial challenge, I would construe the "threatening behavior" prong of the disorderly conduct statute consistent with our prior decisions as well as with the limitations of the First Amendment, as we have done in connection with the "abusive language" prong of that statute. This construction incorporates ample safeguards for free speech insofar as it requires, in addition to a "true threat" in the constitutional sense, (1) an intent to

31

threaten; (2) an objective threat; and (3) a finding of intent, or at least recklessness, with respect to the public disruption engendered by the threatening behavior.

¶ 58. In construing another provision of the disorderly conduct statute that raises First Amendment concerns, we have narrowed the reach of that provision to include the activity the Legislature sought to regulate, but only to the extent permitted under the U.S. Constitution. In State v. Read, we considered a facial challenge under the First Amendment to the prong of the disorderly conduct statute addressing "abusive language." 165 Vt. 141, 680 A.2d 944 (1996). We noted the longstanding " 'tenet of First Amendment law that in determining a facial challenge to a statute, if it be "readily susceptible" to a narrowing construction that would make it constitutional, it will be upheld.' " Id. at 146, 680 A.2d at 947 (quoting Virginia v. Am. Booksellers Ass'n, 484 U.S. 383, 397 (1988)). And we emphasized our obligation "to narrow and limit the statute in light of the protections guaranteed by the United States and Vermont constitutions." Id.; see also State v. Cantrell, 151 Vt. 130, 134, 558 A.2d 639, 642 (1989) ("Where possible, a statute must be construed to avoid constitutional infirmities."). Accordingly, in Read, we held that the "abusive language" prong of the disorderly conduct statute could only reach abusive language that falls outside the protection of the First Amendment—namely, "fighting words." 165 Vt. at 148, 680 A.2d at 948. More recently, in State v. Tracy, we reaffirmed this approach to construction of the statute, emphasizing that in modern times, speech that would meet the constitutional test for "fighting words" is rare, if it exists at all. 2015 VT 111, ¶¶ 35-38, 200 Vt. 216, 130 A.3d 196. I would take the same approach to the "threatening behavior" prong of the disorderly conduct statute and limit its reach to threatening behavior that may be proscribed under the First Amendment— including speech that constitutes a "true threat" under the caselaw set forth above.

¶ 59. While this construction is broader than the majority's construction, at least with regard to the scope of verbal threats subject to regulation under the statute, its scope is subject to three important limitations that mitigate the free speech concerns that it raises.

¶ 60.    First, whatever state of mind is required relative to the risk of public annoyance or inconvenience, the speaker of a "true threat" under our disorderly conduct statute must intend to threaten.  We recognized in Cole that the word "threaten" includes "some element of volition," namely, "a communicated intent to inflict harm on person or property."  150 Vt. at 456, 554 A.2d at 255.  Accordingly, although courts are divided as to whether the constitutional test for "true threats" is an objective standard from the perspective of the speaker, we have already recognized that under our disorderly conduct statute the speaker must intend to threaten.  Compare In re Robert T., 2008 WI App 22, ¶ 11 (explaining test for true threats "is an objective standard from the perspectives of both the speaker and listener"), with United States v. Cassel, 408 F.3d 622, 631 (9th Cir. 2005) (concluding that in Black, U.S. Supreme Court established "intent to threaten" as essential to "constitutionally punishable threat"); see also Parr, 545 F.3d at 499-500 (noting federal appellate courts are divided on question of whether true threat requires subjective intent on part of threatener).

¶ 61.    Second, whether the content of the threatening communication, taking into account the full context, rises to the level of a true threat is evaluated from the objective perspective of a reasonable, similarly situated person, and is not based on the particular response of a recipient of the threat.  See State v. Gagne, 2016 VT 68, ¶ 23, 202 Vt. 255, 148 A.3d 986 ("[W]hether conduct amounts to a threat is generally discerned from the perspective of a reasonable person under similar circumstances."); see also United States v. Bagdasarian, 652 F.3d 1113,1118-23 (9th Cir. 2011) (explaining that analysis of threats includes both subjective and objective considerations: whether reasonable person hearing statement would understand it as serious expression of intention to inflict bodily harm, and whether defendant had subjective intent to communicate threat); Brewington v. State, 7 N.E.3d 946, 963, 969 (Ind. 2014) (considering both whether speaker subjectively intends threat to place victim in fear of bodily harm or death, and whether reasonable

person, similarly situated to victims, would fear for their safety or that of someone close to them on account of threat).

¶ 62.    Finally, in addition to the intent to convey a threat, the speaker must also intend to cause public inconvenience or annoyance, or recklessly create such a risk.  This requirement keeps the ultimate focus of the disorderly conduct statute aligned with its purpose: to protect against public disturbances more generally.  See supra,¶¶ 46-48.

¶ 63.    The disorderly conduct statute requires reckless or intentional creation of a public inconvenience or annoyance.  We have on several occasions addressed the "public annoyance" requirement.  In State v. Lund, we upheld the disorderly conduct conviction of a defendant who yelled at a sheriff and attempted to bite the sheriff's hand at the sheriff's office and local jail.  144 Vt. 171, 173-74, 475 A.2d 1055, 1057-58 (1987), overruled on other grounds by State v. Begins, 148 Vt. 186, 531 A.2d 595 (1987).  In response to the defendant's argument that the statute did not apply because members of the public were not present, we explained, "[p]ublic is defined as a place open to common or general use."  Id. 144 Vt. at 179, 475 A.2d at 1060-61 (quotation omitted).  Because the sheriff's office fell within this definition, the statute applied.  We reiterated this analysis in Cole, concluding that defendant's act of grabbing a flashlight from a law enforcement officer alongside a public highway was sufficiently public because a public roadway "is clearly open to general and common use."  150 Vt. at 456, 554 A.2d at 255.  "Public" is not defined in Vermont's disorderly conduct statute, but is defined in the Model Penal Code section upon which our statute is based as "affecting or likely to affect persons in a place to which the public or a substantial group has access; among the places included are highways, transport facilities, schools, prisons, apartment houses, places of business or amusement, or any neighborhood."  Model Penal Code § 250.2(1)(c).  Public disturbances may occur "in such privately owned facilities as stores, apartment houses, and theaters, but the Model Code does not follow prior statutes making it criminal to disturb the "peace and quiet of any person."  Id. cmt. 2

34

at 329. The model code does not authorize police intrusion into the home or place of business to control private misbehavior.[17]

¶ 64.  These three factors, in addition to the requirement that the threats themselves meet the constitutional standard for "true threats" further limit the scope of the "threatening behavior" prong of the disorderly conduct statute.

### III. A Reasonable Jury Could Conclude That Defendant's Communications In This Case Are True Threats

¶ 65.  A reasonable jury could conclude that defendant's communications amount to "threatening behavior" and constitutionally unprotected true threats because, taking the evidence in the light most favorable to the State and considering the context of the flyers as well as their actual language, the jury could conclude that defendant intended to threaten the victims, and that a reasonable person in the victims' circumstances would understand defendant's communications as an actual threat. The singling out of these particular minority victims for receipt of the flyers, the history of the Ku Klux Klan and the imagery of hooded Klansmen and burning crosses, and

---

[17]  This raises questions as to whether the State's charge would have survived a motion to dismiss on this factor. Two of the most significant factors in support of the State's claim that defendant's communications amounted to "true threats"—that they were targeted at only minority individuals in a predominantly white, nonhispanic neighborhood, and they were delivered inside or by the doors of the victims' homes—undermine the State's claim that defendant's actions created a public nuisance. The fact that, once publicized in the media, defendant's flyers caused great public outcry cannot be sufficient to satisfy the "public nuisance" requirement at the heart of the disorderly conduct statute. If that were so, any act of private brawling or private tumultuous behavior could be deemed a public nuisance if the news coverage of the event generated public outcry. Had defendant blanketed the neighborhood with flyers, the State's case as to public nuisance would be far more compelling; even though the flyers may have all been distributed inside screen doors, the scale of distribution could reasonably have supported the inference of intent to cause public disturbance, or recklessness in doing so. But if defendant had blanketed the predominantly white neighborhood with these Ku Klux Klan recruitment flyers—without the targeting relied upon by the State to support its prosecution—his communications would not qualify as "true threats" as opposed to "political hyperbole." See Watts, 394 U.S. at 708 (describing protester's statement that if forced to carry a rifle "the first man I want to get in my sights is L.B.J." as political hyperbole). Because this case comes to us on a conditional plea, and defendant has preserved his right to appeal only those issues raised in his motion to dismiss, this issue is not before us.

35

the anonymous and intrusive placement of the flyers in the doors of the victims' homes are three critical factors that, in combination, support this conclusion.

¶ 66.    The question for us on appeal is not whether, as a matter of law, defendants engaged in threatening behavior that communicated a constitutionally unprotected true threat, and is not how the Court construes the evidence, but, rather, is whether a properly instructed reasonable jury could find defendant guilty.  We will affirm the trial court's denial of the State's motion to dismiss if the State's evidence "fairly and reasonably tend[ed] to show the defendant guilty beyond a reasonable doubt when we view the evidence in the light most favorable to the State and exclude modifying evidence."  Cole, 150 Vt. at 455, 554 A.2d at 254-55 (quotation omitted).  This threshold is high: "Because the grant of a motion to dismiss precludes a jury from hearing any evidence and because a jury is in the best position to weigh facts and deliver a verdict, courts should grant a [motion to dismiss] only when there is no evidence to support a guilty verdict." State v. Baird, 2017 VT 78, ¶ 2, __ Vt. __, 175 A.3d 493 (quotation omitted).

¶ 67.    Moreover, we consider whether a reasonable jury could conclude that defendant's communications amount to "true threats," not whether this Court itself reaches that conclusion. See United States v. Stevens, 881 F.3d 1249, 1252 (10th Cir. 2018) ("Whether a reasonable jury could find [defendant's] statements to be true threats is a question of law.  If there is no question that a defendant's speech is protected by the First Amendment, the court may dismiss the charge as a matter of law.  But absent an unusual set of facts, the question whether statements amount to true threats is a question generally best left to a jury." (citation, quotations, and alteration omitted)); Turner, 720 F.3d at 419 (noting that most cases involving threats are within broad expanse of varying fact patterns which may not be resolved as matter of law, and indicating that court should affirm conviction for threats "if the evidence at trial was sufficient to permit a reasonable jury to find that [defendant's] conduct constituted a threat"(citations omitted)); Fogel v. Collins, 531 F.3d

824, 829 (9th Cir. 2008) ("Deciding whether political speech is protected political hyperbole or an unprotected true threat can be an issue for a jury, particularly in cases of criminal prosecution.").

¶ 68. In reviewing defendant's appeal based on the trial court's denial of his motion to dismiss, we view the State's evidence in the light most favorable to the State, and excluding any modifying evidence. State v. Elkins, 155 Vt. 9, 17-18, 580 A.2d 1200, 1204 (1990). That means, for example, that we discount the evidence that defendant distributed the offending flyers broadly, and accept as fact that he delivered them only to the two individuals identified in the complaint. As the trial court noted, defendant left one flyer between one victim's screen door and her inner door. In order to do that, defendant had to "ascend a set of stairs, walk across her porch, and open the screen door." Defendant left the other flyer in the victim's mailbox, which also required defendant to walk directly to the second victim's front door. Further, we must draw the most prosecution-friendly inferences concerning the defendant's intent that the evidence can support.

¶ 69. The critical question in this case is whether a reasonable person in the position of the target of defendant's threats would understand that an actual threat had been made. Stevens, 881 F.3d at 1253. The specific language of a communication and the context in which the statements are made are both relevant. Id.; see also United States v. Dillard, 795 F.3d 1191, 1201 (10th Cir. 2015) (explaining statement is true threat if "reasonable recipient could conclude, based on the language of the communication and the context in which it is delivered, that this was in fact a veiled threat of violence by defendant").

¶ 70. The fact that a communication does not expressly articulate a threat of violence or harm, while relevant, is not dispositive in the "true threats" analysis. We have recognized that "[l]anguage may be treated as a threat to harm a victim, even in the absence of an explicit statement to do so, as long as circumstances support the victim's fearful or apprehensive response." Albarelli, 2011 VT 24, ¶ 20 (quotation omitted). Courts should avoid "rigid adherence to the literal meaning of a communication without regard to its reasonable connotations derived from its

ambience" as ingenious threateners "can instill in the victim's mind as clear an apprehension of impending injury by an implied menace as by a literal threat." Turner, 720 F.3d at 422 (holding that public statements that judges should be killed, describing murder of another judge's family, and posting judges' photos and work addresses amounted to true threats); see also Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coal. Of Life Activists, 290 F.3d 1058, 1075 (9th Cir. 2002) (en banc) ("The fact that a threat is subtle does not make it less of a threat." (quotation omitted)).

¶ 71.  Moreover, the context of a communication, both immediate and historical, is highly relevant to understanding whether it amounts to a threat. "Context is critical in a true threats case and history can give meaning to the medium." Planned Parenthood of the Columbia/Willamette, Inc., 290 F.3d at 1078. "[W]ithout context, a burning cross or dead rat mean nothing." Id. at 1079. For example, where an anti-abortion defendant was aware that a "GUILTY" poster would likely be interpreted by a doctor in the reproductive health services community who was identified on one as a serious threat of death or bodily harm, given the previous pattern of "WANTED" posters identifying a specific physician followed by the physician's murder, the poster was "true threat." Id. at 1063, 1079. Similarly, in United States v Hart, the Eighth Circuit concluded that a defendant's parking Ryder trucks in the driveways of a reproductive health clinic could be construed as a threat to intimidate the clinic in the context of, among other factors, ongoing protests and violence against such clinics and the similarity of the defendant's actions to the well-known events of the Oklahoma City bombing. 212 F.3d 1067, 1072 (8th Cir. 2000).[18]

---

[18]  "Context" considerations may run the other way as well, preserving constitutional protection for statements that on their face are explicitly threatening. See, e.g., State v. Krijger, 97 A.3d 946, 960-61 (Conn. 2014) (concluding that in context of angry interaction following town hearing, defendant's menacing statements about town lawyer suffering same fate as lawyer's son who had recently been injured in car accident were more reasonably understood as hurtful blow leveled in frustration, and not as serious expression of intent to cause lawyer harm of nature suffered by his son); Watts, 394 U.S. at 708 (concluding that in context defendant's expression of intent to shoot President if conscripted into army was "very crude offensive method of stating a political opposition to the President" and could not be reasonably interpreted otherwise).

¶ 72. A threat need not suggest "imminent" harm to lose its constitutional protection. See, e.g., Parr, 545 F.3d at 497 ("A threat doesn't need to . . . specify when it will be carried out."); DeLoreto, 827 A.2d at 682 ("The threat need not be imminent to constitute a constitutionally punishable true threat."); People v. Lowery, 257 P.3d 72, 78 (Cal. 2011) (rejecting contention that statute violates First Amendment because it lacks any requirement that threat to harm crime victim or witness is to be carried out immediately, or that defendant have apparent ability to carry it out). But see United States v. Fullmer, 584 F.3d 132, 154 (3d Cir. 2009) ("While advocating violence that is not imminent and unlikely to occur is protected, speech that constitutes a 'true threat' is not.").

¶ 73. Applying these standards, although I believe this is a close case, I conclude that a reasonable jury, drawing permissible inferences from the evidence most favorable to the State, could conclude that defendant's communications amount to true threats. I rely primarily on three closely related considerations.

¶ 74. First and foremost, the jury could infer that these communications were specifically directed at two individuals, one identified as African American and one identified as Mexican, in a predominantly white, nonhispanic neighborhood. This factor is critical. If this was, in fact, a general recruitment solicitation for the Ku Klux Klan, as suggested by the majority, ante, ¶ 34, the State would lose. A communication merely urging people to join an organization, even a heinous one with unlawful or violent goals, is not a true threat. See Brandenburg v. Ohio, 395 U.S. 444, 447 (1969) ("[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."). But, as noted above, a jury must consider the facial language of the communication in its actual context.

¶ 75.   The evidence viewed in the light most favorable to the State is that defendant acknowledged that he would usually choose "white" neighborhoods for distributing such flyers, and that the only two people to whom he actually delivered the flyers are members of ethnic or racial minorities.  Given that members of racial and ethnic minorities are not typically considered prime recruits for the Ku Klux Klan, a reasonable jury could conclude that defendant's targeted communications to a black person and a Mexican person were not intended to communicate a message of recruitment and would be reasonably understood to convey a different message—albeit veiled.  Moreover, the fact that the communications were targeted at the two victims bolsters the argument that the communications were threats directed at them in particular, rather than general political advocacy of a menacing message.  See Fogel, 531 F.3d at 830 (explaining that whether speech is directed at specific individuals is relevant to whether speech can reasonably be characterized as protected political rhetoric or hyperbole).

¶ 76.   Second, the historical and modern-day association of hooded Klan members carrying burning crosses with intimidation of and violence against racial and ethnic minorities and their perceived allies is deeply ingrained in our nation's DNA.  In Virginia v. Black, the U.S. Supreme Court traced the history of the Ku Klux Klan and its use of cross burning as a tool of intimidation.  538 U.S. at 352-57 (plurality opinion).  The Court explained that a 1905 book portrayed the by-then-defunct Klan from the post-Civil War Reconstruction period as heroes, and depicted the Klan as burning crosses to celebrate the execution of former slaves.  Id. at 353.  This publication, and the 1915 movie it inspired—The Birth of a Nation—launched the second genesis of the Klan.  Id. at 353-54.  A poster advertising the film "displayed a hooded Klansman riding a hooded horse, with his left hand holding the reins of the horse and his right hand holding a burning cross above his head."  Id. at 354.  From that time on, "the association between cross burning and the Klan became indelible."  Id.

40

¶ 77. The Court traced the activities of the Klan, and its use of cross burning, through the twentieth century, explaining that the Klan often used cross burnings as a tool of intimidation and a threat of impending violence. Id. at 354. It described cross burnings in front of synagogues, proposed housing projects, and union halls, explaining, "[t]hese cross burnings embodied threats to people whom the Klan deemed antithetical to its goals. And these threats had special force given the long history of Klan violence." Id. at 355. The Court described bombings, beatings, shootings, stabbings, and mutilations in response to the civil rights movement of the 1950s and 1960s, and noted that "[m]embers of the Klan burned crosses on the lawns of those associated with the civil rights movement, assaulted the Freedom Riders, bombed churches, and murdered blacks as well as whites whom the Klan viewed as sympathetic toward the civil rights movement." Id. at 355-56. The Court recognized that

> when a cross burning is directed at a particular person not affiliated with the Klan, the burning cross often serves as a message of intimidation, designed to inspire in the victim a fear of bodily harm. Moreover, the history of violence associated with the Klan shows that the possibility of injury or death is not just hypothetical. The person who burns a cross directed at a particular person often is making a serious threat, meant to coerce the victim to comply with the Klan's wishes unless the victim is willing to risk the wrath of the Klan.

Id. at 357. The Court concluded that "the First Amendment permits Virginia to outlaw cross burnings done with the intent to intimidate because burning a cross is a particularly virulent form of intimidation." Id. at 363. The Court concluded that insofar as the Virginia statute appeared to allow a jury to infer an intent to intimidate from the fact of burning a cross alone, it was facially invalid. Id. at 367. The Court reversed the conviction of one defendant who had burned a cross at what the Court characterized as a "political rally," and reversed and remanded the other convictions to leave open the possibility that the Virginia statute might be construed on remand in a way that was different from the Court's understanding. Id. at 367.

41

¶ 78.    In his dissent, Justice Thomas wrote, "[i]n every culture, certain things acquire meaning well beyond what outsiders can comprehend.  That goes for both the sacred, and the profane.  I believe that cross burning is the paradigmatic example of the latter."  Id. at 388 (Thomas, J., dissenting) (citation omitted).  Justice Thomas described the Klan as "a terrorist organization, which, in its endeavor to intimidate, or even eliminate those it dislikes, uses the most brutal of methods," and concluded, "[i]n our culture, cross burning has almost invariably meant lawlessness and understandably instills in its victims well-grounded fear of physical violence."  Id. at 389-91.

¶ 79.    I recognize that this case does not involve an actual cross burning.  That would present a much easier case.  But even though we do not today see the breadth and severity of the violence associated with the Klan of a prior era, the legacy of the Klan and the violence it represents is not a dead letter in today's America.  The potency of the burning cross symbol, and the organization with which it is so closely associated, shapes the context of the communications in this case.  Even a crude drawing of a hooded member of the Klan riding a hooded horse while raising a burning cross, when distributed selectively to two minority individuals in a predominantly white, nonhispanic neighborhood, can reasonably be understood to impart a substantial veiled threat.

¶ 80.    Third, a jury could conclude that by placing the flyers anonymously in or next to the front doors of the victims homes, defendant intended to convey a message —"I know who you are and I know where you live"—calculated to arouse fear of violence or harm from an unknown enemy.  The trial court found that in order to place one of the flyers, someone would have to ascend a set of stairs, walk across the victim's porch, and open the screen door.  The second flyer was folded and inserted into a victim's mailbox, located next to her front door.  The U.S. Supreme Court has concluded that "true threats" are not protected speech.  The primary interests identified by the Court as the basis for its conclusion are "protect[ing] individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility

that the threatened violence will occur." Black, 538 U.S. at 360 (plurality opinion) (quoting R.A.V., 505 U.S. at 388). An approving invocation of the history and goals of the Klan or the act of cross burning in a public debate about racial justice, or even a protest in the town park, might be deeply unsettling and disturbing, but would not rise to the level of constitutionally unprotected speech. But an anonymous flyer with imagery deeply associated with extreme violence toward racial and ethnic minorities distributed exclusively to a member of a racial or ethnic minority in a primarily white, nonhispanic community inside the resident's screen door would reasonably engender particular fear if part of the message conveyed was, "I have stood here, on the threshold of your home. You don't know who I am, but I know who you are and where you live."

¶ 81. In other contexts, courts have consistently recognized the particular privacy interest people enjoy in their homes and the immediate surroundings. State v. Blow, 157 Vt. 513, 518, 602 A.2d 552, 555 (1991) (invoking "deeply-rooted legal and societal principle that the coveted privacy of the home should be especially protected"); see also Frisby v. Schultz, 487 U.S. 474, 484 (1988) ("Our prior decisions have often remarked on the unique nature of the home . . . and have recognized that preserving the sanctity of the home, the one retreat to which men and women can repair to escape from the tribulations of their daily pursuits, is surely an important value." (quotations and alterations in original omitted)); Rowan v. U.S. Post Office Dep't, 397 U.S. 728, 737 (1970) ("The ancient concept that a man's home is his castle into which not even the king may enter has lost none of its vitality . . . ." (quotations omitted)). Even in cases in which the U.S. Supreme Court has struck down restrictions on "door-to-door" advocacy, the Court has acknowledged the significance of privacy interests in one's home:

> Of all the methods of spreading unpopular ideas, [house-to-house canvassing] seems the least entitled to extensive protection. The possibilities of persuasion are slight compared with the certainties of annoyance. Great as is the value of exposing citizens to novel views, home is one place where [people] ought to be able to shut [themselves] up in [their] own ideas if [they] desire[].”

> . . . .

43

There is, of course, no absolute right under the Federal Constitution to enter on the private premises of another and knock on a door for any purpose . . . . We cannot say . . . that door-to-door canvassing and solicitation are immune from regulation . . . whether the purpose of the regulation is to protect from danger or to protect the peaceful enjoyment of the home.

Hynes v. Mayor & Council of Borough of Oradell, 425 U.S. 610, 619-20 (1976) (quotation omitted) (first alteration in original). I do not mean to suggest that the distribution of political flyers to someone's doorstep is not constitutionally protected; it clearly is, subject to reasonable restrictions. But the distribution of literature extolling the Ku Klux Klan, when delivered only to two targeted individuals who are racial or ethnic minorities, is especially threatening when delivered inside the curtilage of their homes.

¶ 82. This is a difficult and close case. I admit that most, though not all, of the reported appellate decisions dealing with true threats involve more explicit threats of violence, or at least more strongly implied suggestions of extreme violence or death. The law surrounding "true threats" remains unsettled on many issues.[19] And just as threats delivered to one's doorstep may be particularly unsettling, political leafleting and door-to-door canvassing are time-honored, vital and constitutionally protected means of sharing heartfelt views on matters of religion, politics, human rights, and other subjects. The potential tension in this case between the values of free expression and personal security is real.

¶ 83. Moreover, there is much in this record to suggest that defendant's actions did not amount to true threats, and that a properly instructed jury would have concluded that his flyers, while repugnant, were constitutionally protected. If he distributed the flyers more broadly, as he claimed, his actions clearly fell on the "political advocacy" side of the somewhat elusive line between unprotected speech and protected advocacy. Although it could conclude otherwise, a jury could well have been persuaded that defendant lacked the requisite intent to threaten—that he was

---

[19] For a helpful analysis, see generally M. Strasser, Advocacy, True Threats, and the First Amendment, 38 Hastings L.Q. 339 (2011).

more of a bumbling patron of an organization that gave him a sense of purpose, albeit a misguided one, and that he did not intend to actually threaten anyone. The jury may well have decided that as unsettling as the flyers were in light of their manner of distribution, they did not amount to true threats as defined in constitutional terms. And, as I noted above, I believe the State's ability to satisfy the public nuisance requirement of the disorderly conduct statute may have been compromised by its necessary reliance on the highly targeted, nonpublic nature of defendant's placement of flyers at only two homes.

¶ 84. But I am constrained by the record as it comes to us and the standard of review that applies, and for the reasons set forth above, I respectfully dissent.

¶ 85. I am authorized to state that Chief Justice Reiber joins this dissent.

_____
Associate Justice